**H. MUEHLSTEIN & CO., Inc., v. HICKMAN.**

**In re HANNIBAL RUBBER CO.**

Circuit Court of Appeals, Eighth Circuit.

April 24, 1928.

No. 7892.

1. Sales ⊚⟿82(1)—Seller discovering insolvency of buyer, held entitled to demand cash on deilvery and to refuse delivery upon credit terms of contract of sale.

Where seller became aware of insolvency of the buyer, in that buyer was unable to pay debts as they became due in ordinary course of business, held that seller was entitled to demand payment of cash on delivery and to refuse to deliver goods upon the credit terms of the contract of sale.

2. Contracts ⊚⟿310—Insolvency does not relieve from breach of contract.

Insolvency does not operate to relieve from breach of contract.

3. Bankruptcy ⊚⟿314(1)—Claimant can recover only in manner and to extent prescribed by Bankruptcy Act (11 USCA).

In bankruptcy, claimant can recover only in the manner and to the extent prescribed by the Bankruptcy Act (11 USCA).

4. Sales ⊚⟿56—Where seller's business office and place of shipment was at New York City, and acceptance was mailed to seller in New York, contract of sale held New York contract.

Where proposal of seller to sell goods was issued from Chicago, business office of seller, and place of shipment was at New York City, and acceptance was mailed to seller in New York, and contractual relation thus consummated, the contract of sale was a New York contract.

5. Sales ⊚⟿195—Seller's demand of cash on delivery and refusal to deliver on credit terms of contract on discovering buyer's insolvency held not to relieve buyer from its obligations.

Where seller, on discovering insolvent condition of buyer, rightfully demanded cash on delivery and refused to deliver goods upon credit terms of contract, such action did not operate to relieve buyer from its obligation, since option to seller was direct result of breach incidental to insolvency.

6. Contracts ⊚⟿279(1)—Formal tender is unnecessary, where party sought to be charged has expressly refused to comply with contract or placed himself in position in which performance is impossible.

The necessity of a formal tender is obviated by the acts of the party sought to be charged, as by his express refusal in advance to comply with the terms of the contract in that respect, or where it appears that he has placed himself in position in which performance is impossible.

7. Sales ⊚⟿384(2)—As respects damages seller need not avail himself of anticipatory breach, but may wait.

As respects damages, a seller is not compelled to avail himself of an anticipatory breach, but may await until full period of performance has expired.

8. Bankruptcy ⊚⟿318(2)—Seller, on buyer's refusal to perform under terms legitimately demanded by seller, held entitled to claim on buyer's bankruptcy for deficiency resulting from sale.

Where seller, on learning of buyer's insolvency refused to deliver goods upon credit terms of contract of sale but demanded cash on delivery, and on buyer's refusal to comply with demand liquidated its damages by sale of property, held that seller was entitled to claim, on bankruptcy of buyer, for deficiency resulting from such sale.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

In the matter of the Hannibal Rubber Company, bankrupt; J. T. S. Hickman, trustee in bankruptcy. From a decree confirming the report of the master disallowing its claim, H. Muehlstein & Co., Inc., appeals. Reversed and remanded, with directions.

Jesse P. Dice, of Akron, Ohio (E. C. Myers and Robert Azar, both of Akron, Ohio, on the brief), for appellant.

Berryman Henwood, of Jefferson City, Mo., and John L. Burns, of Troy, Mo., for appellee.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. Appellant is a New York corporation, carrying on its business at New York City. The bankrupt, Hannibal Rubber Company, was a Missouri corporation, doing business at Hannibal in said state. November 13, 1923, by proposal and acceptance, appellant and the bankrupt entered into a contract, the material parts of which are in the words and figures following:

"H. Muehlstein & Company, Inc., 114 West Van Buren Street.
"Contract No. C–761
"Chicago, Ill., Nov. 13, 1923.

"Crude Rubber Department, Hannibal Rubber Co., Hannibal, Mo.—Gentlemen: We have this day sold you the following: 50 tons (112,000 lbs.) prime standard rib smoked sheets (free from mold) 27¾ cts. per lb. Ex store or ex dock New York, N. Y. Delivery 25 tons last week February, 1924; 25 tons last week March, 1924. Reweights N. Y. * * *

"Terms: 30-day trade acceptance from date of shipment, without interest.
"Yours respectfully,
"[Signed] H. Muehlstein & Company, Inc.,
"By O. Stein."

"H. Muehlstein & Company, Inc., 41 East 42d Street, New York City—Dear Sirs: We hereby accept your contract No. C–761 calling for 50 tons (112,000 lbs.) prime standard rib smoked sheets at 27¾ cts. per lb. and agree to buy same on the terms and conditions named in said contract C–761.

"Yours very truly,
"The Hannibal Rubber Company,
"By F. H. Smith, Purchasing Agent."

At the time of the making of the contract, the affairs of the bankrupt were much involved. Of this, however, appellant had no knowledge. As found by the master:

"A controversy arose among the stockholders and the directors over the management, and at the January, 1924, meeting of the stockholders a new board of directors was elected, the former general manager discharged, and another selected in his place.

"The new management ascertained that they had past-due outstanding indebtedness of over $100,000, a suit pending in the state court for $17,000 on a past-due trade acceptance, and practically no money. Neither the banks nor the stockholders were willing to advance any new funds, and it appeared to the new board of directors and management that operations of the factory would have to be discontinued. They had at the time current assets consisting of accounts payable, raw material, work in process, and finished product of a book value of approximately $190,000, in addition to their fixed assets of land, building, and machinery, all unincumbered, of the book value of $300,000. In this emergency, and probably to protect the property of the company and the interest of all the creditors, in the event of a judgment and levy in the pending suit for $17,000, the board of directors, on February 13, 1924, passed a resolution declaring its inability to pay its debts and its willingness to be declared a bankrupt on the ground of insolvency.

"A further resolution was passed reciting the passage of the other resolution, and the fact that there was a large amount of new material and work in process on hand, and authorizing the continued operation of the plant for a limited period, with the view of saving the raw material and work in process.

"It further appeared that in December, 1923, a large number of the creditors of bankrupt formed a creditors' committee and presented a proposition providing for the liquidation of the current assets of the bankrupt, under the supervision of said committee and the impounding of the funds realized therefrom, and the payment thereof pro rata to the creditors, the ceasing of operation of the factory after March 1, 1924, with provision that no new materials were to be purchased under future contract. This proposition appears not to have been finally accepted by bankrupt, however, until April, 1924."

Shortly prior to February 28, 1924, appellant learned that the bankrupt was thus heavily indebted, and had suspended payment of all its past-due indebtedness, was unable to pay its debts as they fell due in the usual course of trade or business, had suspended the operation of its factory, and

would be unable to pay for the rubber in accordance with the terms of its contract with appellant if shipments should be made in accordance with the terms of that contract. Appellant had been advised not to ship under the contract except for cash. Accordingly, on the date last mentioned, appellant's vice president visited the bankrupt at Hannibal, there learned its condition, and informed the bankrupt that claimant would not deliver the rubber under the terms of the contract, to wit, on 30-day trade acceptance from date of shipment, but offered to ship and deliver the rubber with sight draft attached to the bill of lading; that is, for cash upon delivery. The bankrupt was willing to accept the rubber upon the contract terms, but not upon those proposed by appellant. The attitude of the parties is best reflected by the correspondence which ensued between them. February 28, 1924, the bankrupt delivered the following writing to appellant's vice president:

"In view of your advice that you cannot ship rubber to us on our contract for February shipment except on sight draft against bill of lading terms, wish to advise that we cannot accept shipment on these terms and therefore request that you do not make shipment until further advised."

On April 15, 1924, the period within which deliveries were to be made having expired, without further advice from the bankrupt, appellant wrote the bankrupt as follows:

"In accordance with your previous request we have been withholding shipment of the 50 tons of prime ribbed smoked sheets rubber which you purchased from us, but we cannot continue to hold this contract open.

"Because of your admitted financial condition, we must ask cash for the goods and cannot, as heretofore stated, extend you the credit which we would like to. Therefore, we hereby request you to give us shipping instructions for the 50 tons of rubber by Friday, April 18, 1924, and either to send us cash for the amount of the rubber to be shipped at the contract price or to permit us to ship it to you sight draft against bill of lading. We are ready and anxious to make the shipment of the entire 50 tons and hope that you can arrange to take and pay for it.

"If you cannot comply with this request and give us shipping instructions in accordance with the above by April 18, 1924, we will consider that the contract has been repudiated by you, and will act accordingly, expecting to wash the contract at the market price, and expecting you to pay us the damage resulting from your failure to accept and pay for the rubber, including in the damage the difference between the contract and the market price, and such other loss as we may have sustained."

This letter was not answered until April 19, 1924. By letter to appellant of that date, the bankrupt said:

"Referring to your letter of the 15th, wish to advise that at the present time we cannot give you shipping instructions on rubber purchased from you under contract dated November 13th, and cannot advise when definite shipping instructions could be given you in accordance with the revised terms which you have specified in your letter."

On April 18th, having received no reply to its letter of the 15th, appellant sold the 50 tons of rubber covered by the contract at 22⅜ cents per pound, being the market price at New York, the origin of shipment, making a loss against the contract sale price of 27¾ cents per pound of $6,020. On the same date it wired the bankrupt to this effect, and advised that the loss in that amount was charged to the account of the bankrupt.

August 11, 1924, the Hannibal Rubber Company, finding itself unable to continue, filed its voluntary petition in bankruptcy. Adjudication followed, and appellee Hickman was duly appointed its trustee.

December 26, 1924, appellant filed its claim in the sum of $6,762.62; this included an item for freight, storage, and cartage, in the sum of $617.62, and interest to August 11th in the sum of $125. The master finds that the item of $617.62 was abandoned, and we find no substantial evidence to support it. The claimant also recognized a set-off in the bankrupt's favor in the sum of $597.87; this item is conceded. Upon its claim, as filed, the claimant prayed interest at the rate of 6 per cent. per annum from August 11, 1924, the date of filing the petition in bankruptcy. The net claim therefor, exclusive of interest, is $5,547.13.

The matter was referred to a master for liquidation of the claim and for making report upon its merits. The trustee filed answer admitting the execution of the contract, alleging that claimant failed and refused to deliver the rubber, or any part thereof, at the time agreed upon for delivery, and thereafter; that the rubber company was at all times ready and willing to receive delivery in accordance with the terms of the contract. He denied indebtedness in the amount claimed, or in any other sum, and prayed to be discharged from liability.

The master found the financial condition

of the bankrupt to be as above stated, and that that condition did not materially change between November 13, 1923, and May 1, 1924; that during all said times the bankrupt did not have sufficient cash to meet its maturing trade obligations and accounts as they fell due in the usual course of its trade and business; that in the sense that the bankrupt was unable to meet its obligations as they became due in the usual course of trade or business, it was during all said time insolvent, but was not insolvent as that term is defined by the Bankruptcy Act (11 USCA); that all the indebtedness of the bankrupt, except this claim of appellant, has been fully paid; and that there is a balance in the hands of the trustee in bankruptcy of $33,000. He further found that, at the time of the making of the contract for the sale of the rubber, appellant either knew, or by reasonable inquiry, which it might then have made, could have known, the financial condition of the bankrupt, that at all times appellant was able to deliver the rubber specified in the contract, and that the bankrupt was willing to receive and accept delivery under the terms of the contract, but not otherwise.

In his conclusions, the master takes the view that by the action of claimant and bankrupt on February 28, 1924, it might be held that the parties thereby rescinded the contract of November 13, 1923, by mutual consent, but he does not so find or hold. He concedes that, when claimant became aware of the unsettled financial condition of the bankrupt, it had the right to demand payment on delivery, or additional security, and could lawfully refuse to deliver the goods without it—citing, Parsons on Contract, vol. 1, p. 534, and Florence Mining Co. v. Brown, 124 U. S. 385, 8 S. Ct. 531, 31 L. Ed. 424. Upon this point he reaches the following conclusion:

"But this principle of the law of sales is a shield of defense to the vendor and protects him against the vendee should the latter sue him for failure to deliver. It does not authorize the vendor to require the vendee to enter into a new or modified contract of sale, upon different or more onerous terms. Neither does this principle of itself make such new contract between the parties, nor does it give rise to a cause of action in favor of the vendor upon such new contract. It simply and solely protects the vendor against liability for his failure to deliver."

The master further found that, in any event, if cash terms were insisted upon, an allowance should be made in lieu of the 30 days' interest on the money incidental to the 30-day trade acceptance; also that, if the issues be found for complainant, then, in any event, the breach accrued on the last day of February, 1924, and that claimant's damage would be confined to the difference between the market price on that day and the contract price. These points are also incidentally submitted for our consideration.

[1] The court confirmed the report of the master, and accordingly decreed that the claim of appellant be disallowed. The conclusion of the master, as sustained by the court, that the right of a vendor, upon becoming aware of the insolvency of the vendee, to demand payment on delivery, and to refuse to deliver goods upon the credit terms of a contract, is merely a shield of defense to the vendor, was erroneous.

In Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 589, 36 S. Ct. 412, 414 (60 L. Ed. 811, L. R. A. 1917B, 580), the Supreme Court said:

"It is no longer open to question in this court that, as a rule, where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach."

The following language in Roehm v. Horst, 178 U. S. 1, 19, 20 S. Ct. 780, 787 (44 L. Ed. 953), is quoted with approval:

"The parties to a contract which is wholly executory have a right to the maintenance of the contractual relations up to the time for performance, as well as to a performance of the contract when due."

The opinion in Central Trust Co. v. Chicago Auditorium then continues as follows:

"Commercial credits are, to a large extent, based upon the reasonable expectation that pending contracts of acknowledged validity will be performed in due course; and the same principle that entitles the promisee to continued willingness entitles him to continued ability on the part of the promisor. In short, it must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance; and, in this view, bankruptcy proceedings are but the natural and legal consequence of something done or omitted to be done by the bankrupt, in violation of his engagement. It is the purpose of the Bankruptcy Act, generally speaking, to permit all creditors to share in the distribution

of the assets of the bankrupt, and to leave the honest debtor thereafter free from liability upon previous obligations. Williams v. U. S. Fidelity Co., 236 U. S. 549, 554 [35 S. Ct. 289, 59 L. Ed. 713]. Executory agreements play so important a part in the commercial world that it would lead to most unfortunate results if, by interpreting the Act in a narrow sense, persons entitled to performance of such agreements on the part of bankrupts were excluded from participation in bankrupt estates, while the bankrupts themselves, as a necessary corollary, were left still subject to action for nonperformance in the future, although without the property or credit often necessary to enable them to perform. We conclude that proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach of an executory agreement, within the doctrine of Roehm v. Horst, supra."

In Roehm v. Horst it is held that an option should be allowed to the injured party either to sue immediately, or to wait until the time when the act was to be done, still holding the contract as prospectively binding for the exercise of this option.

The finding of the master in this regard was evidently founded upon such language as is to be found in Crummey v. Raudenbush, 55 Minn. 426, 56 N. W. 1113, to the effect that:

"Where the vendor has contracted to sell personal property on credit, if, before payment, and while he still retains possession of the property, he discovers that the vendee is insolvent, he may hold the goods as security for the price."

This language, as applied to the case before that court, merely states a defensive shield to the vendor. But, as we have seen, and shall see further, the principle goes much farther than this. In Pratt v. Manufacturing Co., 115 Wis. 648, 92 N. W. 368, the rule is thus stated:

"In case the element of credit in an executory contract for the sale of property is removed because of the insolvency of the vendee, the contract stands in all respects the same as any sale for cash on delivery; and if it is breached by neglect or refusal of the vendee to consummate the transaction by paying the price agreed upon and accepting the property, the vendor may treat the contract as broken and thereupon proceed by any one of the following ways to redress the wrong: He may store the property for the buyer and sue for the purchase price; or may sell the property and recover any deficiency resulting; or may keep the property

as his own and recover the difference between the contract price and the market price at the time of the breach and at the time and place of the delivery. * * *

"If a person contracts to sell and deliver property to another on credit, not retaining any lien thereon, specifically, to secure the purchase money, the presumption is that he acts upon the belief that the latter is solvent, and on condition that he will so remain."

The same rule is announced in Lincoln v. Charles Alshuler Mfg. Co., 142 Wis. 475, 125 N. W. 908, 28 L. R. A. (N. S.) 780. The same principle is thus impliedly stated in Florence Mining Co. v. Brown, 124 U. S. 385, 8 S. Ct. 531, 31 L. Ed. 424:

"The insolvency of the vendee in a contract for the sale and future delivery of personal property in installments, payment to be made in notes of the vendee as each installment is delivered, is sufficient to justify the vendor for refusing to continue the delivery, unless payment be made in cash; but it does not absolve him from offering to deliver the property in performance of the contract if he intends to hold the purchasing party to it; he cannot insist upon damages for nonperformance by the insolvent without showing performance on his own part, or an offer to perform, with ability to make the offer good."

[2, 3] The great weight of authority supports these conclusions. Insolvency does not operate to relieve from breach of contract. In bankruptcy, of course, the claimant can recover only in the manner, and to the extent, prescribed by the act.

[4] In this case, the proposal of the vendor was issued from Chicago, in the state of Illinois. The business office of appellant and the place of shipment was at New York City. The acceptance was mailed to appellant in New York, and the contractual relationship thus consummated. In our judgment, this was a New York contract, but, whether it be viewed as one governed by the laws of New York, Illinois, or Missouri, the rule is the same. The Uniform Sales Act in force in New York and Illinois is as follows:

"A person is insolvent within the meaning of this act who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due, whether he has committed an act of bankruptcy or not, and whether he is insolvent within the meaning of the federal bankruptcy law or not."

The rule in Missouri is thus stated:

"Insolvency, whether of a corporation or a natural person, means inability to pay debts as they become due in the ordinary

course of business." Bushman v. Bushman, 311 Mo. 551, 279 S. W. 122.

The master states that the bankrupt was insolvent in this sense, and that no change took place in its condition between November 13, 1923, and May 1, 1924. This is the sense in which the term "insolvency" is generally used when applied to persons in commercial pursuits. 32 C. J. 806. This is the nature of insolvency which converts a contract to sell personal property on credit into one for cash on delivery at the option of the seller. Crummey v. Raudenbush, 55 Minn. 426, 56 N. W. 1113, and cases above cited.

[5] Appellant had no knowledge of the bankrupt's condition at the time the contract was entered into. Solvency was presumed, and the duty of investigation and inquiry was not imposed. Upon discovering that condition, it had a right to demand cash on delivery, but this did not operate to relieve the buyer from its obligation. This option to the seller was a direct result of the breach incidental to insolvency. As said in Central Trust Co. v. Chicago Auditorium, supra:

"It must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance."

We know of no rule of law which demands a reduction of the sale price in such cases in lieu of the credit terms of the contract.

There is no evidence tending to show attempted rescission. The attitude of the parties in this respect is reflected in the correspondence. From this it is obvious that the bankrupt treated the contract as in force even by the terms of its letter of April 19th above quoted.

[6, 7] It was necessary, of course, that the seller should be in a position to perform and should tender performance. The master finds, as the evidence shows, that ability to perform on the part of appellant was at all times present; and the record shows that such performance was tendered. The necessity of a formal tender is, in fact, obviated by the acts of the party sought to be charged as by his expressed refusal in advance to comply with the terms of the contract in that respect, or where it appears that he has placed himself in a position in which performance is impossible. Ziehen v. Smith, 148 N. Y. 558, 42 N. E. 1080. The seller is not compelled to avail himself of an anticipatory breach, but may await until the full period of performance has expired. The rule is thus clearly stated by Judge, now Chief Justice, Taft in Brevard Tannin Co. v. Mosser Co. (C. C. A. 4) 288 F. 725, 729:

"The provision for delivery by monthly installments of four tanks before September 26th had been clearly waived by the parties, and the deliveries of the tanks not delivered had been postponed by their acquiescence. The defendant has no right to insist that plaintiff's damages should be measured by the market prices in the preceding months, when with consent of the plaintiff it delayed deliveries. These principles are clearly established by the authorities."

[8] On the date of sale in April, the periods of deliveries had all expired without performance and with refusal to perform under the terms legitimately demanded by appellant. The latter chose to liquidate its damages by a sale of the property and thus incidentally to recoup its loss so far as the profits of the sale could effect that result. By its claim it seeks to recover, setting up the deficiency resulting from the sale as evidence of its loss; that sale was properly made at the conceded market price prevailing at the place of delivery and the time of the ultimate breach. The master finds that a balance of $33,000 remains in his hands after the payment of all debts except the claim of appellant. We think appellant is entitled to judgment for the net amount of $5,547.13, with interest thereon from date of sale, to wit, April 18, 1924.

The decree below is reversed, and the cause remanded, with direction to enter judgment for appellant pursuant to the views herein expressed.